# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE EZELL, et al.,<br><br>        Plaintiffs,<br><br>  v.<br><br>EDWARDS THEATRES, INC., et al.,<br><br>        Defendants. | 1:04-CV-6533-SMS<br><br>ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION (DOC. 65)<br><br>ORDER DIRECTING THE PARTIES TO PARTICIPATE IN AN INFORMAL TELEPHONIC SCHEDULING CONFERENCE ON JANUARY 23, 2007, AT 9:00 A.M. |

Plaintiffs are proceeding with a civil action in this Court. By order dated February 23, 2005, entered upon to the parties' consent, Judge Robert E. Coyle assigned this action to the undersigned Magistrate Judge for all proceedings, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73(b), and Local Rule 73-301.

Pending before the Court is the motion of Defendants Edwards Theatres, Inc., and Turner Security Systems, Inc., for summary judgment or, in the alternative, summary adjudication, filed on November 10, 2006, along with a notice of motion, a memorandum in support of the motion, the declarations of Christine A. Kohler and Tim Funaoka, and a statement of undisputed facts. Plaintiffs filed opposition, including a memorandum in response to the

1

motion, factual statement, a motion to seal a document pursuant to protective order, and a declaration of Elizabeth Brancart in opposition to the motion. Defendants filed a reply, including a memorandum, reply statement of undisputed facts, and objections to evidence. Without leave being sought or granted by the Court, Plaintiffs filed on December 13, 2006, opposition regarding the declaration of Denise Sandoval; on December 14, 2006, Defendants filed a reply to Plaintiff's response to their evidentiary objections.

The matter was heard on December 15, 2006, with all counsel appearing telephonically. Appearing for the moving Defendants were Christine A. Kohler and Michael R. Lindsay. Appearing on behalf of the Plaintiffs was Elizabeth Brancart. After argument, the matter was submitted to the Court.

Thereafter Plaintiffs filed a notice of intention to dismiss their negligence claim, each side to bear its own costs. Defendants have not responded to such notice.

II. <u>Summary Judgment</u>

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

1  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It is the

2  moving party's burden to establish that there exists no genuine

3  issue of material fact and that the moving party is entitled to

4  judgment as a matter of law. British Airways Board v. Boeing Co.,

5  585 F.2d 946, 951 (9th Cir. 1978).

6      Where a party with the ultimate burden of persuasion at

7  trial as to a matter moves for summary judgment, it must

8  demonstrate affirmatively by evidence each essential element of

9  its claim or affirmative defense and must establish that there is

10  no triable issue of fact as to each essential element such that a

11  rational trier of fact could render a judgment in its favor.

12  Southern California Gas Co. v. City of Santa Ana, 336 F.3d 885,

13  888 (9th Cir. 2003). If a party moves for summary judgment with

14  respect to a matter as to which the opposing party has the

15  ultimate burden of persuasion at trial, then the moving party

16  must show that the opposing party cannot meet its burden of proof

17  at trial by establishing that there is no genuine issue of

18  material fact as to an essential element of the opposing party's

19  claim or defense; the moving party must meet the initial burden

20  of producing evidence or showing an absence of evidence as well

21  as the ultimate burden of persuasion. Nissan Fire Ltd. v. Fritz

22  Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). In order to carry

23  its burden of production, the moving party must either produce

24  evidence negating an essential element of the opposing party's

25  claim or defense or show that the nonmoving party does not have

26  enough evidence of an essential element to carry its ultimate

27  burden of persuasion at trial. Id. (citing High Tech Gays v.

28  Defense Indus. Sec. Clearance Office, 895 F.2d 563, 574 (9th Cir.

1 1990)). In order to carry its ultimate burden of persuasion on
2 the motion, the moving party must persuade the court that there
3 is no genuine issue of material fact. Id.

4      However, "where the nonmoving party will bear the burden of
5 proof at trial on a dispositive issue, a summary judgment motion
6 may properly be made in reliance solely on the pleadings,
7 depositions, answers to interrogatories, and admissions on file."
8 Celotex Corp. v. Catrett, 477 U.S. 317, 323. Indeed, summary
9 judgment should be entered, after adequate time for discovery and
10 upon motion, against a party who fails to make a showing
11 sufficient to establish the existence of an element essential to
12 that party's case, and on which that party will bear the burden
13 of proof at trial. Id. "[A] complete failure of proof concerning
14 an essential element of the nonmoving party's case necessarily
15 renders all other facts immaterial." Id. In such a circumstance,
16 summary judgment should be granted, "so long as whatever is
17 before the district court demonstrates that the standard for
18 entry of summary judgment, as set forth in Rule 56(c), is
19 satisfied." Id. at 323.

20      If the moving party meets its initial responsibility, the
21 burden then shifts to the opposing party to establish that a
22 genuine issue as to any material fact actually does exist.
23 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
24 586 (1986). In attempting to establish the existence of this
25 factual dispute, the opposing party may not rely upon the denials
26 of its pleadings, but is required to tender evidence of specific
27 facts in the form of affidavits or admissible discovery material
28 in support of its contention that the dispute exists. Rule 56(e);

1  <u>Matsushita</u>, 475 U.S. at 586 n.11. The opposing party must

2  demonstrate that the fact in contention is material, i.e., a fact

3  that might affect the outcome of the suit under the governing

4  law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986);

5  <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809

6  F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine,

7  i.e., the evidence is such that a reasonable jury could return a

8  verdict for the nonmoving party, <u>Wool v. Tandem Computers, Inc.</u>,

9  818 F.2d 1433, 1436 (9th Cir. 1987).

10      In the endeavor to establish the existence of a factual

11  dispute, the opposing party need not establish a material issue

12  of fact conclusively in its favor. It is sufficient that "the

13  claimed factual dispute be shown to require a jury or judge to

14  resolve the parties' differing versions of the truth at trial."

15  <u>T.W. Elec. Serv.</u>, 809 F.2d at 630. Thus, the "purpose of summary

16  judgment is to 'pierce the pleadings and to assess the proof in

17  order to see whether there is a genuine need for trial.'"

18  <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)

19  advisory committee's note on 1963 amendments). The evidence of

20  the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255,

21  and all reasonable inferences that may be drawn from the facts

22  placed before the court must be drawn in favor of the opposing

23  party, <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United States v.</u>

24  <u>Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)(per curiam)).

25  Nevertheless, it is the opposing party's obligation to produce a

26  factual predicate from which an inference may be drawn. <u>Richards</u>

27  <u>v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal.

28  1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987). Although the

Court must not weigh the evidence, the Court must draw reasonable inferences; evidence that is too insubstantial or speculative may be insufficient to establish the existence of a genuine issue of material fact. Coca-Cola Co. v. Overland, Inc., 692 F.2d 1250, 1255 (9th Cir. 1982); Dept. of Commerce v. U.S. House of Rep., 525 U.S. 316, 334 (1999). To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. A mere scintilla of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party. Anderson, 477 U.S. at 251-52. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Id. at 587.

The showings must consist of admissible evidence, Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324, 1335 n.9 (9th Cir. 1980), or pleadings, depositions, answers to interrogatories, admissions, and affidavits or declarations, Fed. R. Civ. P. 56(c). Affidavits shall be based on personal knowledge, set forth such facts as would be admissible in evidence, and show affirmatively that the affiant is competent to testify to the matters stated therein. Fed. R. Civ. P. 56(e). Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. Id. Declarations pursuant to 28 U.S.C. § 1746 may be used with the same force and effect as affidavits. Pollock v. Pollock, 154 F.3d 601, 611, n.20 (6th Cir. 1998). Personal knowledge may be inferred from declarations themselves, such as from facts

6

1   concerning a declarant's position and participation, <u>Barthelemy</u>
2   <u>v. Air Line Pilots Ass'n</u>, 897 F.2d 999, 1018 (9th Cir. 1990);
3   however, a court cannot draw an inference about facts not
4   specifically put in the record by a party, and a court will not
5   assume that general averments embrace specific facts needed to
6   sustain a complaint, <u>Lujan v. National Wildlife Federation</u>, 497
7   U.S. 871, 887 (1990).

8       The Court is not obligated to consider matters that are in
9   the record but are not specifically brought to its attention; the
10  parties must designate and refer to specific triable facts. Even
11  in the absence of a local rule, for evidence to be considered,
12  the party seeking to rely on it must specify the fact by
13  indicating what the evidence is or says and must indicate where
14  it is located in the file. Although the Court has discretion in
15  appropriate circumstances to consider other material, it has no
16  duty to search the record for evidence establishing a material
17  fact. <u>Carmen v. San Francisco United School Dist.</u>, 237 F.3d 1026,
18  1029 (9th Cir. 2001).

19      A party moving for summary judgment is entitled to the
20  benefit of any relevant presumptions that support the motion
21  provided that the facts giving rise to the presumption are
22  undisputed. <u>Coca-Cola Co. v. Overland, Inc.</u>, 692 F.2d 1250, 1254
23  (9th Cir. 1982).

24      III. <u>Facts</u>

25      Many of the facts are undisputed, or are undisputed for
26  purposes of this motion.

27      It is undisputed that a Caucasian woman accompanied by a
28  Caucasian man sitting two or three rows in front of Plaintiffs

7

1  Michelle and Valerie Ezell looked at them and rolled her eyes as

2  Plaintiffs found their seats. She looked at them in a way that

3  caused Plaintiff to wonder what was wrong. (Dep. PVE 22, 27-28,

4  117.)

5      Denise Sandoval, who sat behind and to the right of

6  Plaintiffs at the movie, confirmed that the woman had made an

7  ugly face, as if to say, "Don't sit by us."[1]

8      Plaintiff testified that when Charlize Theron appeared on

9  the screen, the whole audience, including two women who were

10  sitting behind Plaintiffs, commented on her looks. (Brancart

11  Decl., Ex. 1, Dep. of Pltf. Valerie Ezell, 23-24.) Plaintiff

12  described the level of her voice as follows: she and her sister

13  were right next to each other, pretty much face-to-face and

14  mouth-to-ear, using a normal speaking voice. She also described

15  the conversation as a whisper among the four women. The women

16  sitting just behind them also made comments that were audible.

17  (Dep. PVE 29-33.) Plaintiff characterized the "mouth to ear"

18  communication with her sister as involving whispering to each

19  other, and Plaintiff would lean in to her; she did not mean that

20  they talked at an otherwise normal level, and her voice was

21  generally low anyway and in any event had not been as loud as it

22  was in deposition. (Dep. PVE 121.)

23      At some point in the movie, Plaintiff called the other

24  female in the movie a "dumb ass." (Dep. PVE 119-20.) Her comments

25  to the movie, as distinct from to her sister, were in Plaintiff's

26

27      [1] Defendants object to the declaration of Denise Sandoval as inadmissible because not produced in discovery, hearsay, immaterial, and incompetence of Sandoval as a witness. However, without waiving these

28  objections, Plaintiffs admit all facts listed in Plaintiff's facts and evidence for the purposes of this motion only. The evidentiary objections are thus not explored because the facts are admitted.

1  normal speaking voice. (Tr. 120.)

2       During a rape scene about ten to fifteen minutes into the
3  movie, Plaintiff, her sister, and others in the audience
4  commented with exclamations regarding the graphic nature of the
5  rape as presented. Later they engaged in exhortations to the
6  raped woman to "Get him back. Don't let him do that to you."
7  Plaintiff Valerie testified that in a normal speaking voice her
8  sister also told the actress to stab the rapist, or to get his
9  ass, or to shoot or kill him. (Dep. PVE 31-32, 120.) Plaintiff
10 Valerie Ezell admitted that after the rape scene, she told her
11 sister that the response of the raped woman was female power,
12 and, "She got his ass. She got his ass." Plaintiff Valerie Ezell
13 admitted that they were loud in talking to the movie screen, but
14 so was everyone else; she could have been talking in her normal
15 speaking voice during the comments about the rape, which would
16 probably seem louder inside of the theater. (Dep. PVE 24, 31-32.)

17      Defendants admit for purposes of this motion that Sandoval
18 observed some comments during the rape scene; the sisters were
19 not doing any more than anyone else in the theater and were not
20 talking as much as the ladies above them; and Plaintiff Michelle
21 observed others talking throughout the movie, with a lot of
22 people reacting to different parts of the movie.

23      Not even a couple of minutes later during a time when
24 Plaintiffs were not talking, Leist, the woman sitting below
25 Plaintiffs, stood halfway up, turned to Plaintiffs, and yelled,
26 "You two niggers shut up." (Dep. P Valerie Ezell (PVE) at 24, 34,
27 37.) Plaintiffs were shocked and confused that she was referring
28 to them.

Defendants admit for purposes of this motion that the white people turned around and said something like, "shut up you two niggers." Further, the sisters looked around, but they were the only black people in the auditorium.

Defendants admit for the purposes of this motion that the white people kept turning and looking back at the black ladies, who remained quiet and watched the movie.

Plaintiff Michelle Ezell told the woman to turn around; however, the woman continually looked in Plaintiffs' direction and once again said, "Yeah, I mean you. I mean you." Michelle told her to shut the fuck up and mind her own business. (Dep. PVE p. 25, 35.)

Plaintiff testified that the conversations between the woman and Plaintiff's sister were audible; Plaintiff's sister was not shouting, but Plaintiff was pretty sure that people around them could hear both speakers. (Dep. PVE 40-41.) Plaintiff Valerie Ezell Plaintiff told her sister to calm down.

About forty-five minutes into the movie, the woman then turned and gave Plaintiffs the "middle finger." Plaintiff again told her sister to forget about it. (Dep. PVE 38.)

Defendants admit for the purposes of this motion that the white lady flipped off the Plaintiffs, and then the Plaintiff with the lighter skin told the white lady to "turn around, bitch," which resulted in the while man whispering to the white woman, who got up and left.

The white woman left her seat about fifteen or twenty minutes after beginning the interaction with Plaintiff and her sister, and her male companion remained in his seat and was

1  snickering. (Dep. PVE 26-27, 36.)

2      During the entire time of the conversation between the woman
3  and Plaintiffs, Plaintiff Valerie was aware that the woman's male
4  companion was laughing audibly as if to support the woman's
5  conduct. (Dep. p. 42.)

6      Plaintiff Valerie Ezell admitted that everyone was laughing
7  at scenes in the movie, including Plaintiffs, and they once
8  talked a little bit with two Hispanic ladies sitting behind them,
9  having a short four-way conversation. (Dep. PVE 26-28.) Plaintiff
10 Valerie Ezell did not believe that she was talking any more than
11 anyone else in the theater. (Dep. PVE 40.)

12     The woman returned to her seat, had a conversation with her
13 companion, and then no more than five minutes later two security
14 guards stormed their way into the theater. (Dep. PVE 27.) For the
15 purposes of this motion only, Defendants admit that Sandoval
16 observed the white people appear to be pleased that they had
17 gotten rid of the black ladies; later a police officer came in
18 and asked the white peole to come to the side to talk; and when
19 the movie ended, Sandoval approached Plaintiffs in the parking
20 lot and told them that she had seen what had happened.

21     Plaintiff Valerie Ezell believed that appropriate behavior
22 was not to disrupt people round her; people regularly whispered
23 with a person next to them in a way not to disturb everyone else
24 around them. It is undisputed for purposes of this motion that
25 Plaintiff did not believe that her behavior disturbed others but
26 believed that she and her sister were disturbed. (Dep. PVE 41.)
27 It is not disputed for the purposes of this motion that no other
28 person in her vicinity at the theater addressed her or shushed

11

1  her or asked her to stop talking or be quiet. (Dep. PVE 41.)

2      With respect to the security guards, it is admitted that two
3  guards rushed in; one of the guards was or appeared Caucasian and
4  the other Hispanic. One guard told Plaintiffs to get up and get
5  out of the theater. Defendants admit for the purposes of this
6  motion that the guards charged in, entered like a swat team, and
7  yelled at the sisters to get up and come with them. The sisters
8  had to gather up their belongings and leave their seats.

9      Plaintiffs responded by asking what was going on and why
10 they were being asked to leave. Defendants admit that the ladies
11 looked really surprised; then the security guards got loud and
12 belligerent, disturbing the people who were trying to watch the
13 movie and talking to Plaintiffs as if they had done something
14 really wrong; and the Plaintiffs appeared to be hurt by being
15 singled out like that. For the purposes of this motion only,
16 Defendants admit that Sandoval was surprised that the white
17 people were not also asked to leave by the security guards;
18 further, Sandoval thought that the Plaintiffs would be back
19 inside soon.

20     At a dimly lit area away from the seating area and near the
21 trash can, the guard told them that it was reported that
22 Plaintiffs had started an altercation in the theater and that
23 they would need to leave. Plaintiffs sought to have the
24 complaining party brought out to discuss the situation, told the
25 guards about three times each that they had been called "niggers"
26 inside the theater by the complaining person, and Michelle told
27 the guards twice that the Caucasian woman had flipped them off.
28 The guards asked for Plaintiffs' ticket stubs and addressed them,

calling them "you people" and "you two" more than twice each, or according to Plaintiff Michelle, addressing them only in that fashion. It is undisputed that Plaintiffs testified that the guards did not listen to their side of the story, shouted at them, and interrupted them; the guards had a very harsh demeanor and were pushy, fairly loud, and aggressive, although they did not touch Plaintiffs, use profanity, or make any express comments to Plaintiffs about their race. Plaintiffs testified that they did not use any profanity towards the security guards. It is admitted that neither officer at deposition testified to Plaintiffs' having used any profanity during their contact with the guards.

It is admitted for purposes of this motion that although one guard, Officer Vidrio, asked Plaintiffs for their ticket stubs, he could not recall if he ever asked to see the stub of Lori Leist, the complaining white woman.

Plaintiff Valerie believed that the security guards treated Plaintiffs as they did because of Plaintiff's race based on the guards' conduct appearing to be an extension of the wrong done to them inside the theater; the guards were on the side of the people who had wronged Plaintiffs; the guards would not listen to Plaintiffs; the stance and way of looking at Plaintiffs exhibited by the Caucasian guard indicated that he did not want to hear their story. (Dep. PVE 58-59.) The Court accepts this evidence not as constituting a legal conclusion but rather as evincing Plaintiffs' state of mind and understanding.

Plaintiff Michelle also believed that the actions of the guards were racist because they did not pay attention to

Plaintiffs' complaint about having been called "niggers" inside
the theater, they called Plaintiffs "you two" or "you people,"
and they were unwilling to listen to Plaintiffs' side of the
story and thus simply expected Plaintiffs to have been guilty of
the alleged misconduct. (Decl. of Brancart, Ex. 2, Dep. Plaintiff
Michelle Ezell (PME), 36-37.) Again, the Court accepts this
evidence as reflecting Plaintiff's state of mind and not as
constituting a legal conclusion.

     For the purposes of this motion, Defendants do not dispute
the testimony of Officers Smith and Vidrio, the guards, to the
effect that the guards entered the theater after the white
female, Lori Leist, complained that when she asked them to be
quiet one of the Ezell sisters had told her to "shut the fuck
up." They had not received any other complaints during that
movie. Officer Smith knew only that there was a report of a
disturbance. Leist pointed out the Plaintiffs to Vidrio. Neither
Vidrio nor Smith observed any disturbance or disruptive behavior
when they entered the theater; everything was quiet. Further, the
theater was not completely full and was little more than half
full.

     It is not disputed that the guards refused to give Valerie
their names or badge numbers; Funaoka, the manager, never
provided any information, either. Further, Vidrio admitted at
deposition that although he reported at the time that the police
officer who came out of the auditorium went outside and told
Plaintiffs to leave, he did not really hear what the officer said
because he was inside the building.

     The Edwards operation gives site post orders, patron

14

removal, and security personnel guidance to Turner Security

personnel but does not provide training or other written

guidance. Turner and Edwards have a written contract for Turner

to provide security services to the Edwards Fresno theater

location. Guards Smith and Vidrio were both employees of Turner

Security, performing their duties as Turner Security guards.

The Turner Security manual prohibits discrimination.

With respect to the manager on duty, it is undisputed that

according to Plaintiffs, the theater manager, an Asian man named

Funaoka, approached Plaintiffs in the main theater lobby, asked

Plaintiffs for their ticket stubs, and told them that they needed

to leave the theater. On two or three occasions, the manager

referred to Plaintiffs as "you people" and "you two." Plaintiffs

testified that they told the theater manager about four times

that they had been called "niggers" inside the theater and twice

told him that the Caucasian woman had flipped them off.

It is admitted for purposes of this motion that Funaoka

entered the theater to speak with Leist. He spoke with her in the

hallway of the auditorium and wanted her to tell her side of the

story without having to miss any more of the movie than was

necessary; she was rushed and short about her story; and he did

not tell her that Plaintiffs had complained of her use of a

racial slur or profanity but told her that she was being accused

of being a racist, which she dismissed without a verbal response.

Funaoka then thanked her for her time and apologized again and

allowed her to return to the movie. He did not ask to see her

ticket.

Plaintiff Michelle Ezell testified that she used the word

1  "damn" probably about three times in her conversation with the

2  manager, but no other profanity; Plaintiff Valerie Ezell denied

3  using any profanity with the manager. It is undisputed that

4  Funaoka offered Plaintiffs readmission passes. He said, "Listen,

5  why don't you people give me your ticket stubs and we'll give you

6  a refund." He did not say anything expressly to Plaintiffs about

7  their race or use profanity. The manager refused to permit

8  Plaintiffs to wait for family members watching another movie,

9  including a daughter who was nine months pregnant, inside the

10 theater. Plaintiff left the building.

11     Plaintiff Valerie believed that the manager's actions were

12 based on race because he took the Caucasian woman's side of the

13 story and referred to Plaintiffs as "you two" and "you people."

14 Plaintiff Michelle believed that the managers's actions were

15 racist because of the smirk he had on his face when she told him

16 that Plaintiffs had been called "niggers"; further, he did not

17 listen to them.

18     For the purposes of this motion, Defendants admit that

19 whenever Plaintiff Michelle Ezell told Funaoka they had been

20 called "niggers," he put his head down and smirked, a half smile

21 on his face.

22     The declaration of Funaoka consists of a statement that he

23 was the assistant manager at the theater, had personal knowledge

24 of the facts, and adopted as true and correct and as reflecting

25 his recollection of the events therein described a statement that

26 he prepared on the date of the incident, namely, February 7,

27 2004. The statement reported that Funoaka listened to Plaintiffs'

28 side of the story, which included the white woman telling them to

1   shut the fuck up, Plaintiffs' response of telling her to turn

2   around, and Plaintiffs being flipped off; security guards talked

3   to them and told them to leave; the manager was called, talked to

4   the Plaintiffs, talked to the guards, talked to the Caucasian

5   woman and a gentleman who also was offended by Plaintiffs, and

6   obtained statements from both the woman and the man. The manager

7   then informed Plaintiffs that he wanted their ticket stubs to

8   refund them; Plaintiffs ripped up the tickets and refused the

9   offer; wrote the guard's name down and said they would be filing

10  suit; and left upon the manager's direction to them to leave. The

11  manager also said that in his best judgment, in dealing with all

12  parties, Plaintiffs were very belligerent, foul-mouthed, and

13  threatening, and their use of excessive profanity, threatening

14  body language, and threats of lawsuits were not necessary and

15  very abrasive. The Caucasian woman and the man were very helpful,

16  pleasant, and kind, with a calm and sincere attitude. He stated:

> Their stories collaborated (sic) in full, my first
> impressions of customer A's [Plaintiffs'] demeanor.

Plaintiffs object to the declaration as hearsay. The Court notes

that the declaration meets the requirements of 28 U.S.C. § 1746.[2]

---

[2] Title 28 U.S.C. § 1746 provides:

Wherever, under any law of the United States or
under any rule, regulation, order, or requirement
made pursuant to law, any matter is required or
permitted to be supported, evidenced, established,
or proved by the sworn declaration, verification,
certificate, statement, oath, or affidavit, in
writing of the person making the same (other
than a deposition, or an oath of office, or an
oath required to be taken before a specified
official other than a notary public), such
matter may, with like force and effect, be
supported, evidenced, established, or proved
by the unsworn declaration, certificate,
verification, or statement, in writing of
such person which is subscribed by him, as
true under penalty of perjury, and dated, in

1  The appropriate declaration of truth under penalty of perjury was
2  present. Funaoka declared that he had made the statement on the
3  date of the incident and that the statements he made were true
4  and correct and reflected his recollection of the events
5  described therein; rather than reciting that account, he attached
6  a true and correct copy. It would seem a futile and resource-
7  wasting process to require him to re-type the events.

8      Funaoka is not testifying. Thus, the Court rejects
9  Defendants' assertion that this constitutes an adoption of a
10 statement by a witness testifying and subject to cross-
11 examination within the meaning of Fed. R. Evid. 801(d)(1).
12 However, it does qualify as a declaration.

13     With respect to hearsay, it would appear that the statements
14 made by others that were reported in the declaration of Funaoka
15 were mentioned not for the purpose of showing that they were
16 true, but rather to show that they were made and their effect on
17 those who heard them. Funaoka's characterizations of the demeanor
18 and attitudes of the various participants appears to be
19 descriptive of their conduct and of his reaction or state of mind

20

21 _____

22     substantially the following form:

23     (1) If executed without the United States:
       "I declare (or certify, verify, or state)
       under penalty of perjury under the laws
24     of the United States of America that
       the foregoing is true and correct. Executed
       on (date).

25                    (Signature)".

26     (2) If executed within the United States, its
       territories, possessions, or commonwealths:
27     "I declare (or certify, verify, or state)
       under penalty of perjury that the foregoing
       is true and correct. Executed on (date).

28                    (Signature)".

with respect to them, and not necessarily an inadmissible opinion. Plaintiffs admit that Funaoka made the statement. The Court overrules Plaintiffs' objection.

It is admitted for purposes of this motion that Funaoka spoke with Plaintiffs at a distance of a few feet from the guards, but the guards could not hear anything that was said in the conversation despite their proximity; according to the guards, the manager and Plaintiffs were just talking.

It is admitted for the purposes of this motion that Funaoka initially testified that when he returned to the lobby after speaking with Leist, he offered to reseat Plaintiffs, but they immediately turned him down. Later he testified that he had not actually offered to reseat them, but rather had informed them that he would have liked to try to reseat them but it was very full, he had doubts that he could seat them together, and he could offer them a refund to return another time.

It is also admitted for the purposes of this motion that Funaoka initially testified that the sisters had told him that the white woman had used racial slurs; after a break requested by his counsel and after speaking with counsel, Funaoka clarified that the sisters had not told him a "specific thing" about a racial slur, but were just basically accusing the guards, Leist, and him of being racist.

Defendants further admit for the purposes of this motion that although Funaoka claimed that Plaintiffs used excessive profanity that shocked him despite his repeated requests not to use that language, the only words he could identify being used were "bullshit" and "fuck." His claim of threatening body

language was based on Michelle's ripping up her ticket and throwing it at his feet.

It is admitted for purposes of this motion that the manager on duty had the authority to direct Turner Security guards to undertake a project or to deal with a problem. Further, he had the duty to uphold and administer all Regal Entertainment Group (REG) corporate policies and the responsibility to oversee guest relations.

It was undisputed that the movie theater had a right to maintain a non-distracting, movie-going atmosphere for its guests.

With respect to the pertinent practices and procedures, Defendants admit and do not dispute for purposes of this motion that as the testimony of various persons in their organization (Funaoka, general manager Henry Myoshi, District Manager Richard Herman of Regal Entertainment Group) reflected, the practice and unwritten policy and training standard of Edwards theater for ushers and security guards by management when there was a complaint about profanity or a slur was to gather as much information as possible, get a balanced presentation of the facts as possible, and interview other persons who might be neutral or unbiased and not just interview one set of witnesses. A security guard or manager would be sent in to the theater to observe; if it was quiet, the person would observe to see if there actually was a problem. If there was arguing or verbal exchange, then one of the parties would be asked to come out to talk so as to defuse the situation. A guard should determine if the patron was intoxicated or a further risk to anyone present; if the situation

was anticipated to escalate, it would be decided whether or not to ask the patron to come outside to talk more; often all that needed to be done was to have the usher or security guard tell the person to keep it down.

If there is a conflict between the accounts of two patrons, then the policy was to talk to both parties and anyone else available to determine what had happened while keeping the parties apart to avoid violence. If after listening to both sides management does not know who caused the problem, the practice is to remove both parties or try to separate them, and both parties are asked to go to a different movie or come back at a different time; both may be asked to leave.

These processes had been discussed with Funaoka by general manager Miyoshi.

The Regal Entertainment Group's Theatre Management Manual is the only guidance provided to managers regarding removal or ejection of patrons from a theater; it was the policy in effect, and Funaoka was aware of that. It provides that when one or more patrons are causing a disturbance, it is the usher's responsibility to call this matter to their attention and politely ask them to cease; if patrons are spoken to a number of times and become belligerent, they must be removed from the premises

In 2004, it was rare for an adult to be asked to leave the theater.

The incident reports written by security guards should be thorough and accurate.

Use of a racial slur is grounds for removal of the patron

1  making the slur; a patron actually making such a slur should be

2  spoken to and asked to leave. However, Herman was not aware of

3  any patron ever being ejected for the use of racial slurs.

4       It is admitted for the purpose of this motion that because

5  Michelle Ezell had called police about her complaint of racism

6  not being heard, and police had come in to the theater, Funaoka

7  typed a statement, asked security guards to write an incident

8  report, and obtained statements from Leist and a Dr. Thompson,

9  whom Leist had identified as supporting her story. He did so by

10 going in to the movie just as it got out; the statements were

11 written on pen and paper he provided. He did not think about

12 asking anyone else besides Leist and Thompson; the officers did

13 not ask any other patrons for statements or even think about it.

14 This was the only time in six years at the company that Funaoka

15 had solicited statements about other patrons. He wrote his own

16 statement with the threat of a lawsuit in mind.

17     It is undisputed for this motion that Officer Smith never

18 told Leist that the ladies said she had behaved badly and perhaps

19 in a racist manner in the theater. He did not consider

20 interviewing Leist to find out what Plaintiffs were complaining

21 about. Officer Vidrio did not consider asking Leist to step out

22 of the theater or to go in to ask Leist about what the sisters

23 had said she had done.

24     IV. <u>Claim pursuant to 42 U.S.C. § 1981</u>

25     All persons within the jurisdiction of the United States

26 shall have the same right in every state and territory to make

27 and enforce contracts as enjoyed by white citizens. 42 U.S.C. §

28 1981(a). The burden-shifting analysis set forth in <u>McDonnell</u>

1  Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973) applies to
2  suits pursuant to 42 U.S.C. § 1981; a plaintiff must show that he
3  or she 1) is a member of a protected class; 2) attempted to
4  contract for certain services; 3) was denied the right to
5  contract for those services; and 4) such services remained
6  available to similarly situated individuals who were not members
7  of the plaintiff's protected class. Lindsey v. SLT Los Angeles,
8  LLC, 447 F.3d 1138, 1144-45 (9th Cir. 2006).

9              A. Interference with the Right to Contract
10      The making and enforcing of contracts protected by § 1981
11 includes the "making, performance, modification, and termination
12 of contracts, and the enjoyment of all benefits, privileges,
13 terms, and conditions of the contractual relationship." 42 U.S.C.
14 § 1981(b). A showing that Plaintiffs were denied the enjoyment of
15 the same conditions of the contractual relationship during the
16 performance of the contract as white persons would suffice to
17 show denial of a right; for example, a hostile work environment
18 claim may support a violation of § 1981 because it interferes
19 with the enjoyment of all benefits and conditions of a
20 contractual relationship. Manatt v. Bank of America, NA, 339 F.3d
21 792, 797 (9th Cir. 2003).

22      The Court finds to be without merit Defendants' argument
23 that Plaintiffs are unable to establish that they were denied the
24 right to make and enforce a contract. Defendants argue that
25 Plaintiffs contracted for admission, were admitted, began to
26 watch the film, and then breached that contract by not remaining
27 silent, talking, and using profanity during the showing of the
28 movie, which constituted a disturbance. They therefore breached

                                    23

1 their contract and lost the right granted under the contract to
2 see the entire movie.

3     Drawing all reasonable inferences favorable to Plaintiffs,
4 one conclusion made possible by the evidence is that although
5 Plaintiffs did talk during the movie, they did not do anything
6 louder than or different from what many or most of the other
7 persons in the theater did and thus did not initially create a
8 disturbance. Further, the evidence regarding the tone of voice
9 used by Plaintiffs was such that various inferences may
10 reasonably be drawn, including one that with the exception of the
11 time when almost the entire audience was responding to a scene of
12 retribution by the female star, Plaintiffs took careful measures
13 to speak in a voice that was at the level of a whisper. Although
14 Plaintiffs may have spoken in an ordinary speaking voice,
15 additional evidence of context revealed that Plaintiffs used low
16 voices and leaned in to each other; thus, it may be inferred that
17 even the use of a normal speaking voice under the circumstances
18 was not disruptive.

19     Drawing all inferences in favor of Plaintiffs, the evidence
20 warrants a reasonable inference that Leist, who had previously
21 made a very hostile face at Plaintiffs, the only black people
22 there, and who then used a racial epithet at a time when
23 Plaintiffs were not causing a disturbance, also used an obscene
24 gesture towards Plaintiffs. No other person complained about
25 Plaintiffs. Under the circumstances, it may be inferred that
26 Leist proceeded to make an unfair or inaccurate report to guards
27 and management and obtained Plaintiff's ejection from the
28 auditorium because of racial animus. Although there was some

admitted use of profanity on the part of Plaintiffs, the evidence
supports an inference that Leist employed profanity, deeply
offensive racial slurs, and an obscene gesture as well as
disruptive behavior before she left to report the incident.

As to forfeiture of a contractual right by interaction with
the guards, crediting Plaintiff's evidence results in an
inference that Plaintiffs used no profanity and simply sought to
be informed of the reason why they and their belongings were
being removed from the auditorium in an undignified manner, and
to have the guards consider the conduct of Leist and address the
racial slur and obscene gesture that they had suffered at her
hands. Further, reference to the governing procedures and
policies at the theater reveals that one reasonable inference is
that the guards and/or management departed from normal procedures
by not observing in the theater and/or giving warnings before
pulling Plaintiffs out; by aggressively removing Plaintiffs when
there was no continuing or escalating conflict; by not listening
to Plaintiffs' complaints; by favoring Leist by not interviewing
her or asking for her ticket stub or removing her and by
attempting to avoid any interference with her enjoyment of the
movie; and by not investigating fairly due to a failure to seek
witnesses other than the one that appeared to support Leist.
Whether or not Plaintiffs were rightfully removed due to their
interaction with the guards is a disputed issue of fact.

As to Plaintiffs' conduct with management, the evidence
viewed most favorably to Plaintiffs warrants the conclusion that
Funaoka treated Leist and Plaintiffs differently, evincing no
concern with Plaintiffs' desire to complete their viewing of the

25

film while attempting to facilitate Leist's enjoyment of her
contractual privileges and not even asking her for her ticket or
about the racial slur or profanity that the evidence warrants a
reasonable inference that she had used. Also, it may be inferred
that Funaoka declined to take seriously Plaintiffs' complaints;
and he exaggerated the profanity and hostility involved in his
interaction with Plaintiffs, who admitted using "damn" about
three times and whose only assertedly threatening body language
was to tear up the ticket in front of theater agents. A
reasonable trier of fact could find that Funaoka's version of the
conversation was untrue because of the inconsistencies in his
testimony regarding his offer to reseat Plaintiffs and his
changed testimony after a break with his lawyer with respect to
whether or not Plaintiffs had told him that Leist had used racial
slurs. Further, the fact that Funaoka anticipated a lawsuit could
be considered by a reasonable trier of fact in evaluating the
statement he made on the day in question.

Because the evidence regarding whether or not Plaintiffs
created a disturbance or misbehaved with guards or management is
disputed, there is an issue of material fact as to whether or not
Plaintiff breached their contract. A rational interpretation of
the contract between the parties is that the contract was to
watch the film either to its completion or to a point at which
Plaintiffs voluntarily departed without creating a distracting
atmosphere. It cannot be said that Plaintiffs enjoyed their full
contractual rights because they were ejected from the auditorium
and the theater. Compare, Youngblood v. Hy-Vee Food Stores, Inc.,
266 F.3d 851 (8th cir. 2001) (where consumer had purchased his

1  item, contract of purchase was at an end). <u>Jeffery v. Home Depot</u>
2  <u>USA, Inc.</u>, 90 F.Supp.2d 1066 (S.D.Cal.2000), cited by Defendants,
3  may be distinguished because there the only interference was a
4  delay in service while a cashier requested to search the bag of
5  the plaintiff purchaser; the consumer was able to make the
6  purchase and leave the store. Here, the ejection occurred before
7  the movie was completed, and the evidence shows that Plaintiffs
8  clearly wanted to complete their viewing of the film. The delay
9  in enjoyment of contractual benefits that management suggested
10 could occur--that is, the suggestion that Plaintiffs return at
11 another time to watch the film--amounted to a cessation of the
12 privilege for which Plaintiffs had contracted.

13      Accordingly, Defendants have not shown that they are
14 entitled to judgment as a matter of law with respect to
15 Plaintiff's showing of interference with the performance and/or
16 enjoyment of the benefits of a contract.

17           B. <u>Different Treatment</u>

18      Defendants argue that Plaintiffs cannot show that
19 individuals similarly situated with them who are not African-
20 American were treated differently from Plaintiffs. Defendants
21 assert that for purposes of management's determination of who
22 should leave, because Funaoka stated that Plaintiffs were
23 belligerent, foul-mouthed and threatening, and because he said
24 Leist was kind, Plaintiffs were not similarly situated.

25      However, the evidence when viewed most favorably to
26 Plaintiffs warrants an inference that Leist was similarly
27 situated in that she created a disruption in the theater by using
28 a racial slur and profanity, persisted by continuing to look

1   around, and used an obscene gesture. Plaintiffs disputed the
2   extent of their own use of profanity and the nature and tenor of
3   the conversation. The Court considering all the circumstances
4   cannot conclude as a matter of law that using "damn" several
5   times, in a conversation that was not heated and was in a normal
6   tone of voice, and tearing up theater tickets justified
7   Plaintiffs' ouster. Leist's alleged conduct was a basis for
8   removal from the theater according to Defendant's policies, but
9   she was not treated or investigated in the same way as Plaintiff.

10       V. <u>Plaintiff's Showing of Racial Motivation or Animus</u>

11       Defendants contend, and Plaintiffs agree, that with respect
12  to all the discrimination claims, the <u>McDonnell Douglas</u> burden-
13  shifting model applies to the analysis of discriminatory animus
14  or motivation, which is required for establishment of a claim
15  pursuant to § 1981, <u>Lindsey v. SLT Los Angeles, LLC</u>, 447 F.3d
16  1138, 1144 (9th Cir. 2006); § 42 U.S.C. § 2000a (the Civil Rights
17  Act of 1964, prohibiting denial of equal access to public
18  accommodations because of race), <u>Akiyama v. United States Judo,</u>
19  <u>Inc.</u>, 181 F.Supp.2d 1179, 1187 (W.D.Wash.2002); and the
20  California Unruh Civil Rights Act, <u>Green v. Rancho Santa</u>
21  <u>Margarita Mortgage Co.</u>, 28 Cal.App.4th 686, 694-99 (1994).
22  Further, it is contended that the California unfair business
23  practices claim pursuant to Cal. Bus. & Prof. Code fails if the
24  practices found unlawful under other laws also fail and are the
25  only basis for the claim. <u>Lazar v. Hertz Corporation</u>, 69
26  Cal.App.4th 1494, 1505-06 (1999).

27       It is admitted that Defendants have a legitimate business
28  interest in maintaining a non-disruptive, movie-going environment

28

1   for their guests. Thus, Defendants argue that because Plaintiffs
2   behaved in a disrupting manner with the patrons in the
3   auditorium, with the guards, and with the manager, Defendants
4   have shown that they had a legitimate business reason for
5   ejecting Plaintiffs which Plaintiffs cannot rebut.

6       A plaintiff must carry the initial burden to establish a
7   prima facie case of racial discrimination. Thereafter, the
8   employer has the burden of proof to articulate a legitimate,
9   nondiscriminatory reason for the challenged action. The plaintiff
10  must then show by a preponderance that the employer's stated
11  reason for the action was in fact mere pretext. McDonnell Douglas
12  Corporation v. Green, 411 U.S. 792, 802-806 (1973); Texas
13  Department of Community Affairs v. Burdine, 450 U.S. 248, 253
14  (1981).

15      In order to demonstrate a prima facie case, a plaintiff must
16  offer evidence that gives rise to an inference of unlawful
17  discrimination. Burdine, 450 U.S. at 253-54. A plaintiff may
18  accomplish this by introducing direct evidence of discriminatory
19  intent (i.e., evidence which, if believed, proves the fact [here
20  discriminatory animus] without inference or presumption, Godwin
21  v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998); by
22  introducing evidence that suggests that the employment decision
23  was based on an illegal discriminatory criterion; or by using
24  factors such as those set forth in McDonnell Douglas at 802
25  (there, showing membership in a protected class, qualification
26  for a position, rejections despite qualifications, and the
27  employer's continuing to seek applicants). Cordova v. State Farm
28  Ins. Companies, 124 F.3d 1145, 1148-49 (9th Cir. 1997).

Because the ultimate burden of persuading the trier of fact
that the defendant intentionally discriminated against the
plaintiff remains at all times with the plaintiff, the burden of
persuasion never shifts; rather, a defendant's burden is to rebut
the presumption of discrimination by producing evidence that the
reason for the challenged action was legitimate and
nondiscriminatory. The defendant need not persuade the Court that
it was actually motivated by the proffered reasons; it is
sufficient that the defendant's evidence raises a genuine issue
of fact as to whether it discriminated against the plaintiff.
Burdine, 450 U.S. at 254-55. This requirement is met if the
defendant clearly sets forth through admissible evidence the
reasons for the challenged action that are legally sufficient to
justify a judgment for the defendant. Id. at 255. Once this
burden of production is met, the presumption raised by the prima
facie case is rebutted, and it disappears. Id.

The plaintiff's burden at this point is to persuade the
Court that the plaintiff has been the victim of intentional
discrimination, which may be accomplished either 1) directly by
persuading the Court that a discriminatory reason more likely
motivated the employer, or 2) indirectly by showing that the
employer's proffered explanation is unworthy of credence.
Burdine, 450 U.S. at 256.

The Ninth Circuit Court of Appeals has observed that in a
racial discrimination case under Title VII, the plaintiff, who
must show the employer's intent to discriminate, may submit
circumstantial evidence and/or direct evidence, and the character
of evidence presented as direct or circumstantial does not

30

1  determine whether to apply the analytical framework of McDonnell-
2  Douglas. The Plaintiff may simply produce direct or
3  circumstantial evidence demonstrating that a discriminatory
4  reason more likely than not motivated the actor. McGinest v. GTE
5  Service Corp., 360 F.3d 1103, 1122-23 (9th Cir. 2004). Once the
6  defendant produces evidence of a legitimate nondiscriminatory
7  reason to counter the Plaintiff's demonstration of a prima facie
8  case, the McDonnell Douglas presumption of discrimination drops
9  out of the picture; the sole remaining issue is whether or not
10 there was discrimination. Id. at 1123. Under either approach, a
11 plaintiff must produce some evidence suggesting that the
12 Defendant's action was due in part or whole to discriminatory
13 intent in order to counter the employer's legitimate business
14 explanation. Id. Types of evidence that may demonstrate pretext
15 include proof that the defendant's explanation is unworthy of
16 credence or evidence, or the more direct path of proof that a
17 discriminatory reason more likely motivated the employer. Desert
18 Palace, Inc. v. Costa, 5329 U.S. 90, 100 (2003).

19     Here, Plaintiff has produced evidence that the guards and
20 manager repeatedly or exclusively referred to Plaintiffs as "you
21 people." As noted, the character of the evidence as direct or
22 circumstantial is not determinative. Evidence of this form of
23 address can demonstrate discriminatory animus in context. Alexis
24 v. McDonald's Restaurants of Massachusetts, 67 F.3d 341, 248 (1st
25 Cir. 1995) (reference to two sets of people with only one similar
26 characteristic, race, as "you people" held to evince animus);
27 E.E.O.C. v. Alton Packaging Corp., 901 F.2d 920, 923-24 (11th Cir.
28 1990) (statement by actor to a black employee that "you people

can't do a ----- thing right" characterized as direct evidence of
discrimination, although there not by a decision maker); see, Ash
v. Tyson Foods, Inc., 126 S. Ct. 1195, 1197 (2006) (use of word
"boy" without a modifier was held not benign as a matter of law,
and discriminatory meaning could depend upon context, inflection,
tone of voice, local custom, and historical usage). The Court
acknowledges that there are authorities cited by Defendants
(Reply at 5-6) that indicate that under various circumstances,
references to "you people" were not evidence of discrimination,
as when it was pure speculation that the reference was to blacks,
where some of the people referred to were not black, or where the
reference was to an entire office rather than an ethnic or racial
group. Here, the only people referred to were Plaintiffs, who
were both black. In light of the surrounding circumstances,
including the deviation from procedures and policies in handling
the investigation and ejection, the disparate treatment given to
the white and black participants, the undignified manner in which
Plaintiffs were removed from the auditorium, and the smirk on the
manager's face when Plaintiffs complained of being called
"niggers," the Court finds that a rational trier of fact could
have concluded that the use of the term "you people" to refer to
the sisters was indicative of discriminatory animus based on
their race.

        Evidence that Defendant's guards and manager failed to
investigate the racial slur allegedly used by Leist and,
according to Plaintiffs, repeatedly brought to the attention of
the guards and manager, warrants an inference of racial animus.
As Plaintiffs note, it has been recognized that the word "nigger"

is perhaps the most offensive and inflammatory racial slur in English, a word expressive of racial hatred and bigotry. Swinton v. Potomac Corp., 270 F.3d 794, 817 (9th Cir. 2001). The Plaintiffs repeatedly reported the slur, which pursuant to Defendants' policies was a basis for Leist's removal from the theater; Leist was not even asked about the slur by Funaoka. Further, given the circumstances, a rational trier of fact could conclude that it was highly unlikely that, as claimed by Funaoka, Plaintiffs neglected to mention the slur to the manager. The present case is unlike Lizardo v. Denny's Inc., 270 F.3d 94 (2nd Cir. 2001), because here there is significant evidence that the initially complaining patron herself had previously engaged in conduct towards Plaintiffs in the auditorium that would have justified her own ejection. Further, the content and tenor of the conversations between the guards and the manager on the one hand, and the Plaintiffs on the other, are disputed.

Plaintiffs presented evidence that Defendants repeatedly failed to follow their own procedures in dealing with the problem at the theater. A failure to follow established policies or procedures can be evidence of discriminatory animus. Nabozny v. Podlesny, 92 F.3d 446, 455 (7th Cir. 1996) (citing Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 267 (1977)). Defendants failed to question Leist about the alleged use of the racial slur and profanity (as distinct from the more general allegation of just being a racist) despite its being recognized in the policies or procedures as a basis for speaking to a patron and asking the patron to leave. There is evidence that the investigation was one-sided in that a rational

trier of fact could conclude that the guards and manager did not try to listen to both sides in a balanced manner and did not seek witnesses for both sides; further, Plaintiffs were pulled out and told to leave before the investigation was undertaken. The practice to observe and/or warn before intervening was not followed; Defendants intervened even though at the time they entered the theater, there was silence and an absence of any disturbance.

Defendants argue that it is possible to interpret what the guards and manager did as being consistent with their policies and procedures because an investigation was undertaken, and Defendants' agents determined that it was Plaintiff's fault. Further, at some point Plaintiffs were "unruly" because they used obscenity towards staff, and thus there was cause to remove them. However, Plaintiffs denied using profanity towards the guards and only used "damn" several times during the conversation with the manager. Thus, the use of "obscenity" is disputed. Although one Plaintiff did admit that she used "damn" several times in a conversation with the manager that the guards characterized as simply a conversation, there is an issue as to whether or not, given all the surrounding circumstances, this constituted unruly conduct warranting ejection. The Court further notes that whether or not Defendants actually followed their procedures depends in part upon the resolution of disputed facts concerning what actually happened in the auditorium and the investigation. Disputed issues of fact as to the underlying conduct of Plaintiffs and Leist, as well as the behavior of Defendants' agents in handling the situation remain. Considering all the

factual context, Plaintiffs have produced sufficient evidence to warrant an inference that the established procedures were not followed and that this reflected racial animus.

The fact that an investigation into a racial slur is inadequate may support an inference that the investigator is racially biased. Fuller v. City of Oakland, 47 F.3d 1522, 1535 (9th Cir. 1995). Here, given the context of the treatment of Plaintiffs, a rational trier of fact could infer that the investigators were racially biased because of the one-sided nature of the investigation and the failure to seek any specific factual information from Leist concerning exactly what occurred.

With respect to Defendant's justification of ejecting Plaintiffs in order to maintain a non-disruptive atmosphere, there is a triable issue of fact as to whether the justification is worthy of belief. As previously noted, there are some disputes regarding the underlying conduct of the patrons in the theater. It is undisputed that there was no disruption or dispute visibly or audibly in progress when the guards entered the theater. There was no dispute at the time Plaintiffs were removed from the theater. Funaoka's statement that Plaintiffs used excessive profanity during his conversation with them is unsupported by the testimony of the guards; he characterized Michelle's ripping up the ticket as threatening body language, when a rational trier of fact could have found it not to have been threatening, but rather indicative or frustration, anger, or upset. Further, Funaoka acted with anticipation of a lawsuit, and he gave inconsistent testimony. Specific facts that might permit a negative credibility inference have been set forth.

1    There is evidence before the Court that Funaoka smirked each
2 time Plaintiffs complained of having been called "niggers." Given
3 the context of the humiliating and disparate treatment that
4 Plaintiffs claimed to have received from Funaoka and his guards,
5 a rational trier of fact could find that Funaoka's smirking
6 indicated amusement at, or approval of, the slur, and thus that
7 he had discriminatory intent. See, Chuang v. Univerity of
8 California Davis, Board of Trustees, 225 F.3d 1115, 1128 (9th Cir.
9 2000) (a dean's laughing response to a colleague's statement that
10 "two Chinks" in the pharmacology department were more than enough
11 was determined to establish evidence of discriminatory intent on
12 the part of both speakers).

13    In view of the evidence that the theater was not full, a
14 rational trier could infer that Funaoka was untruthful when he
15 claimed to be unable to reseat the sisters in another part of the
16 theater because it was full. Evidence of untrue excuses given for
17 differential treatment is circumstantial evidence of
18 discriminatory intent. Lindsey v. SLT Los Angeles, LLC, 447 F.3d
19 1138, 1151 (9th Cir. 2006).

20    The Court concludes that considering all the evidence, and
21 drawing all reasonable inferences in favor of Plaintiffs,
22 Plaintiffs have submitted sufficient evidence to permit a
23 rational trier of fact to conclude that it is more likely than
24 not that Defendants acted with the intent to discriminate against
25 Plaintiffs on the basis of their race, and thus to raise disputed
26 issues of material fact as to the discriminatory intent necessary
27 to Plaintiff's discrimination claims. Plaintiff's evidence is
28 sufficient in nature and force to raise a triable issue of fact

1  as to whether or not Defendants' treatment of Plaintiffs was
2  racially motivated.

3       IV. <u>Similarly Situated Persons Treated Differently</u>

4       Defendants argue that Plaintiffs cannot establish that
5  similarly situated non-African American persons were treated
6  differently. The Court notes that it is not clear that the
7  <u>McDonnell Douglas</u> test must be applied in this case in view of
8  the extent of Plaintiffs' evidence that warrants an inference of
9  discriminatory intent. However, assuming for the sake of argument
10 that it would apply, then Plaintiffs have met the requirements
11 for this fourth prong of the test. Leist was sufficiently
12 similarly situated with Plaintiffs because she was accused of
13 having engaged in conduct that warranted expulsion, but she was
14 not subjected to the same humiliating treatment as Plaintiffs,
15 was not subjected to questioning or an investigation with respect
16 to the alleged wrongful conduct, was not ejected, and was
17 supported by Defendants' manager, who sought out witnesses in her
18 behalf and obtained statements. The mere fact that Leist was the
19 first to complain does not logically explain the distinction in
20 treatment considering the severity of the conduct alleged to have
21 been engaged in by Leist.

22      The Court stresses that the evidence has come to the Court
23 in the form of a motion for summary judgment or summary
24 adjudication. It is established that the Court is constrained to
25 view the facts in the light most favorable to the nonmoving party
26 and to draw all inferences in favor of the nonmoving party,
27 including questions of credibility and the weight to be accorded
28 particular evidence; it is not the judge's function to weigh the

evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. Suzuki Motor Corp. v. Consumers Union of U.S., Inc., 330 F.3d 1110, 1140 (9th Cir. 2003).

V. Negligence

Plaintiffs allege in the fifth claim that Defendant Edwards owed a duty to Plaintiffs to operate the theater in a manner that was free from unlawful discrimination, and to hire, train, supervise, and discipline their employees and themselves to fulfil that duty. Plaintiffs allege that Defendant Turner Security owed Plaintiffs a duty to provide security services in a manner free from unlawful discrimination , and to hire, train, supervise, and discipline their employees and themselves to fulfil that duty. Plaintiffs allege that Defendants breached that duty by discriminating against Plaintiffs because of their race, color, or national origin. (Cmplt. p. 6.)

Defendants challenge Plaintiffs' claim, arguing that there is no evidence that any risk of harm to Plaintiffs was reasonably foreseeable.

Under California law, negligence requires a legal duty to exercise due care, breach of the duty, and proximate causation of Plaintiffs' injury. Federico v. Superior Court, 59 Cal.App.4th 1207, 1210-11 (1997). An employer has a duty to third parties where the employer knows or has reason to know facts which would warn a reasonable person that the employee presents an undue risk of harm to third persons in light of the particular work to be performed. Id. at 1213-14; Doe v. Capital Cities, 50 Cal.App.4th 1038, 1054-55 (1996). There is no evidence that Defendants knew

38

1 or had reason to know that Funaoka or either of the guards would

2 act in a racially discriminatory manner.

3     Plaintiffs' response is that there is a common law duty on

4 the part of innkeepers to serve members of the public, citing

5 Bell v. Maryland, 378 U.S. 226, 298 n. 17 (1964) (conc. op.). In

6 Bell, the pertinent discussion concerned common law rules

7 providing historical context for the Fourteenth Amendment, and it

8 was noted that hanging out a sign and opening a house for

9 travelers implied an undertaking to take in guests. The fact that

10 historically there may have been some duty on the part of

11 innkeepers to take people in does not render Defendants liable

12 for the actions of its employees under California tort law

13 because there is an absence of evidence of knowledge, or reason

14 to know, facts that would cause any breach or risk of harm to be

15 foreseeable.

16     Because Plaintiffs have the burden of proof of negligence,

17 and because they have failed to produce evidence of a necessary

18 element of their negligence claim concerning Defendants' duty to

19 hire, train, supervise, and discipline its employees, the Court

20 concludes that Defendants are entitled to summary adjudication on

21 the negligence claim with respect to liability for negligent

22 hiring, training, supervision, or discipline.

23     However, after the hearing, Plaintiffs filed a notice (Doc.

24 88) that Plaintiffs are willing to dismiss their negligence

25 claim, each side to bear their own costs.

26     To the extent that Plaintiffs' negligence claim has not

27 otherwise been dismissed as of the time this order is filed, the

28 Court concludes that Defendants have shown that they are entitled

1  to summary adjudication on the negligence claim with respect to

2  negligent hiring, training, supervision, and discipline. To the

3  extent that Plaintiffs' negligence claim has been dismissed by

4  the time this order is filed, Defendants' motion for summary

5  judgment or summary adjudication on the negligence claim will be

6  denied as moot.

7      VI. <u>Malice</u>

8      Plaintiffs seek punitive damages, alleging that Defendants

9  acted with oppression, fraud, and malice, and with wanton and

10 conscious or reckless disregard of the civil rights of

11 Plaintiffs. (Cmplt. p. 5.) Defendants contend that Plaintiffs

12 have not produced evidence that Defendants intended to

13 discriminate against them or direct evidence sufficient to

14 establish malice with clear and convincing evidence.

15     Plaintiffs state that they seek damages not under California

16 law, but rather pursuant to 42 U.S.C. § 1981, <u>Johnson v. Railway</u>

17 <u>Exp. Agency, Inc.</u>, 421 U.S. 454, 460 (1975), and Title VII,

18 pursuant to which punitive damages may be awarded where the

19 plaintiff shows by a preponderance that the defendant's conduct

20 1) is malicious, such as where it is shown to be motivated by

21 evil motive or intent or purpose to injure another, or 2) is

22 wanton, as where it involves reckless or callous indifference to

23 the federally protected rights of others, such as when under the

24 circumstances, it reflects complete indifference to the

25 plaintiff's safety, rights, or the defendant acts in the face of

26 a perceived risk that its actions will violate the plaintiff's

27 rights under federal law; or 3) is oppressive, such as where it

28 is done in a manner which injures or damages or otherwise

40

violates the rights of another person with unnecessary harshness
or severity as by misuse or abuse of authority or power or by
taking advantage of some weakness or disability or the
misfortunes of another person. 42 U.S.C. § 1981a(b)(1) (malice or
reckless indifference to the federally protected rights of an
aggrieved individual); see, Dang v. Cross, 422 F.3d 800, 806-11
(9th Cir. 2005) (§ 1983). No separate showing of extraordinarily
egregious behavior is required. Kolstad v. American Dental
Assoc., 527 U.S. 526, 538-39 (1999); Zhang v. American Gem
Seafoods, Inc., 339 F.3d 1020, 1041 (9th Cir. 2003) (noting that
intentional discrimination, or discrimination in the face of a
perceived risk that its actions will violate federal law, can be
sufficient).

    Plaintiffs' evidence warrants a rational inference that
Plaintiffs were oppressively removed from the auditorium and
directed to leave with unnecessary harshness and through an abuse
of authority; an intent to discriminate may be inferred.

    Further, a rational trier could infer that Defendants
removed Plaintiffs with knowledge of an extreme risk that
Plaintiffs rights against racial discrimination were being
violated. This is sufficient for malice under Title VII.

    Defendants argue that something more that mere intentional
discrimination is required for punitive damages. It is true that
mere evidence of an intentional violation has been held
insufficient, but the showing required beyond the threshold level
of intent required for compensatory liability is wilful and
egregious conduct, or conduct that displays reckless indifference
(and not mere negligence) to the Plaintiff's federal rights such

41

that the defendant almost certainly knew that what he was ding was wrongful and subject to punishment. <u>Ngo v. Reno Hilton Resort Corp.</u>, 140 F.3d 1299, 1303-05 (9th Cir. 1998), amended 156 F.3d 988, 988-89 (9th Cir. 1998) (holding that merely negligent calculations with respect to taking leave did not support punitive damages). The evidence in this case is sufficient to raise an issue of fact as to whether or not Defendants' conduct was malicious, recklessly indifferent to known federally protected rights of Plaintiffs, and oppressive. As Plaintiffs note, a corporate defendant may be held liable for punitive damages on account of the wilful or egregious conduct of a managerial employee made within the scope of employment so long as the managerial conduct is not contrary to the employer's good faith efforts to comply with Title VII. <u>Kolstad v. American Dental Assoc.</u>, 527 US. 526, 644-46 (1999).

Accordingly, Defendants are not entitled to judgment as a matter of law with respect to Plaintiffs' claim for punitive damages.

VII. <u>Scheduling Conference</u>

As the Court noted at the hearing on the motion, an informal telephonic conference call will be set for the scheduling of further pretrial and trial proceedings. Plaintiffs ARE DIRECTED to place a conference call on January 23, 2007, at 9:00 a.m. by arranging the conference call with the other parties and directing it to Frances Robles at (559) 499-5690 at the appointed time.

VIII. <u>Disposition</u>

Accordingly, it IS ORDERED that

42

1      1) Defendants' motion for summary adjudication IS GRANTED in

2 part with respect to that portion of Plaintiffs' fifth claim for

3 negligence that consists of a claim for negligent hiring,

4 training, supervision, and discipline of Defendants' employees;

5 and

6      2) Defendants' motion for summary judgment IS otherwise

7 DENIED; and

8      3) Plaintiffs ARE DIRECTED to place a conference call on

9 January 23, 2007, at 9:00 a.m. by arranging the conference call

10 with the other parties and directing it to Frances Robles at

11 (559) 499-5690 at the appointed time.

12

13 IT IS SO ORDERED.

14 **Dated:  December 21, 2006**        **/s/ Sandra M. Snyder**
icido3                   UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28